IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOHN RUST, CHARLES J. PALMER, PETER HOCHSTEIN, and STEVEN HARPER, | ) ) ) ) | |
| Plaintiffs, | ) ) | 4:84CV712 |
| v. | ) ) | |
| FRANK GUNTER, Individually and as Director of Correctional Services, CHARLES BLACK, Individually and as warden of Nebraska State Penitentiary, CHARLES HOHENSTEIN, Individually and as Legal Aid Coordinator, JOHN P. SHAW, Individually and as Associate Warden, Programs, TERENCE B. CAMPBELL, Individually and as Legal Aid Coordinator, JOHN T. EGGERS, Individually and as Housing Unit Manager, MARIO PEART, Individually and as Unit Administrator, HAROLD W. CLARKE, Individually and as Associate Warden, Custody, GARY GRAMMER, Individually and as Warden of the Nebraska State Penitentiary, and FRED BRITTEN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | MEMORANDUM AND ORDER ON PENDING MOTIONS |
| Defendants. | ) ) | |

      Now before me are Eric F. Vela's and Jorge A. Galindo's "Amended Motion to Enforce Consent Decree," (ECF No. 95), the Fred Britten's "Motions to Terminate Consent Decree and Dismiss Case," (ECF No. 97), and John L. Lotter's letter, (ECF No. 103), which is listed on the docket sheet as a motion to appoint counsel.  My analysis of these motions follows.

1

## I. BACKGROUND

On August 22, 1986, a consent decree was entered in Rust et al. v. Gunter et al., No. CV 84-L-712, in accordance with the terms of a settlement agreement between a group of prisoners confined in the Nebraska State Penitentiary (NSP) under sentence of death (the plaintiffs) and "employees and officials of the Department of Correctional Services of the State of Nebraska" (the defendants). (See Def.'s Index, Ex. 2 at 1-2, ECF No. 99-2.) Among other things, the consent decree states that "Plaintiffs and all other prisoners now confined or hereafter confined under sentence of death" in the NSP must be given 1) "direct physical access to and use of the Law Library at NSP" for a minimum of two hours per day, five days per week; 2) at least one telephone call per day of not less than ten minutes duration; 3) the use of the exercise yard for at least one hour and fifty-one minutes per day, seven days per week; 4) at least forty minutes of dayroom time per day and at least one visitation per week; and 5) training in legal research, analysis, and writing at least once every six months, with such training to be provided by persons holding law degrees. (See id. at 2-6.) The consent degree also states that its terms "shall apply to Plaintiffs so long as they remain in special custody status solely by reason of the nature of their sentence." (Id. at 6.) It adds, "This Decree shall constitute a permanent injunction against Defendants, in their official capacity, and their successors, and the Court shall retain jurisdiction for enforcement thereof by proper proceedings for contempt or otherwise." (Id. at 6-7.)

On February 5, 2010, Eric F. Vela and Jorge A. Galindo, acting pro se, filed a "Motion for Order of Contempt and Injunctive Relief" in Case No. CV 84-L-712. (See ECF No. 88.)[1] In their motion, Vela and Galindo stated that they are both death row inmates confined at the Tecumseh State Correctional Institution (TSCI) in Nebraska, and they alleged that they had been denied certain rights that are specified in the 1986 consent decree. (See id. at 2, 3-4.) They also asked that counsel be appointed to assist them in "prosecut[ing] this action." (Id. at 4.)

On March 1, 2010, I granted Vela's and Galindo's request for counsel, (see ECF No. 91), and on August 2, 2010, Vela and Galindo filed, through counsel, an "Amended Motion to Enforce Consent Decree," together with a supporting brief, (ECF Nos. 95, 96). Although the amended

---

[1] The case has since been re-designated as Case No. 4:84CV712.

motion supercedes Vela's and Galindo's pro se filing of February 5, 2010, (see ECF No. 102), the August 2 brief includes references to allegations appearing in the February 5 filing, (see, e.g., Br. at 4, ECF No. 96).

In their brief, Vela and Galindo allege that they each received misconduct reports that caused them to be placed in "disciplinary segregation" for approximately one month. (Br. at 3-4, ECF No. 96; Mot. for Contempt at 2, ECF No. 88.) At the conclusion of their disciplinary segregation, they were placed in "administrative segregation" for one year. (Br. at 4, ECF No. 96; Mot. for Contempt at 2-3, ECF No. 88.) They allege that during their administrative segregation, 1) they were given only one hour of law library access per week, 2) they were not given "legal research training by a trained lawyer," 3) they were given only one hour of exercise time in the yard six days per week, and 4) they were not given forty minutes of dayroom time each day. (Br. at 4, ECF No. 96.)[2] Based on these allegations, they argue that TSCI should be found "in contempt of the consent decree as applied to Vela and Galindo." (Id. at 6.) In the alternative, they submit that because the consent decree "has been rendered factually obsolete by virtue of the new location of 'Death Row' [at TSCI]" and "the advancement in technology in the legal system," I should order TSCI "to file a motion to modify the terms of the Consent Decree under Rule 60(b)." (Id. at 6, 8.)

Vela's and Galindo's pro se motion of February 5, 2010, names "Fred Britten, warden of TSCI," as defendant. (Mot. for Contempt, ECF No. 88.) On August 6, 2010, Britten responded to Vela and Galindo's amended motion to enforce the consent degree by filing "Motions to Terminate Consent Decree and Dismiss Case." (ECF No. 97.) In his motions, Britten argues that the consent decree must be terminated pursuant to 18 U.S.C. § 3626, and that Vela and Galindo's motion must be dismissed for failure to state a cause of action. (See generally ECF Nos. 97-98.) In support of the latter point, Britten argues that Vela and Galindo's complaints "relate to the time that they were on Disciplinary Segregation or Administrative Confinement status and housed off of the Death Row Unit," and "there is no basis for [their] claim that they are entitled to the conditions set out in the Consent Decree for the Death Row unit while they are temporarily reclassified as Disciplinary

---

[2] In their Amended Motion, Vela and Galindo also ask this court to enforce the provision of the consent decree that grants death row inmates one call per day of at least ten minutes duration. (Am. Mot. at 2, ECF No. 95.)

Segregation or Administrative Confinement." (Def.'s Br. at 16, 18, ECF No. 98.) He adds, "neither Vela nor Galindo have complained that any of the conditions of the Consent Decree were 'violated' while they resided in the Death Row Unit." (Id. at 21.)

On or about September 9, 2010, John L. Lotter wrote a letter to me that was filed in this case on September 13, 2010, as a "Motion to Appoint Counsel." (ECF No. 103.) In his letter, Lotter states that he favors the dismissal of Vela's and Galindo's case because Vela and Galindo "were on A.C. (Administrative Confinement) and according to the Death Row Consent Decree [they were] not eligible to receive any benefit of the Death Row Consent Decree." (Id. at 1.) However, he opposes the termination of the consent decree because he has "heard that the Department of Corrections prior to the Death Row Consent Decree treated Death Row Status inmates no different than those on segregation," and he believes that "without the Death Row Consent Decree in place the Department of Corrections will gradually take our privileges away." (Id.) He adds that he has "been on Death Row for almost 15 years . . . and . . . can attest to the constant struggle by those on Death Row to keep the Department of Corrections from messing with the privileges we have due to the Death Row Consent Decree." (Id.) He asks, "Your honor, if there is someway [sic] I and the rest of the Death Row Population could be allowed to have our interest represented in Case No. 4:84CV715 [sic] by an attorney, I and the rest of Death Row would be grateful." (Id. at 2.)

Noting that Lotter "may be seeking intervention under Rule 24 of the Federal Rules of Civil Procedure," I ordered the parties to file responses to his letter "regarding the issue of intervention." (Order at 1-2, ECF No. 104.) Counsel for Vela and Galindo responded on October 12, 2010, and argued that intervention should not be allowed because "Mr. Lotter's request for dismissal [of Vela's and Galindo's claims] is directly adverse to the request for relief sought by [Vela and] Galindo," and "it is unclear whether Mr. Lotter's presence in this action creates a conflict of interest due to counsel's representation of Galindo." (Br. at 3, ECF No. 107.) Britten responded on October 22, 2010, and argued that "[t]here is no reason to appoint independent counsel for inmate Lotter in this case" because his "interests in relation to the Consent Decree are the same as . . . Vela['s] and Galindo[']s." (Def.'s Br. at 2-3, ECF No. 111.) Vela and Galindo then filed a response to Britten's argument, stating that Lotter's interests are not, in fact, perfectly aligned with theirs "as to all issues." (Br. at 2, ECF No. 113.)

## II. ANALYSIS

### A. Britten's Motion to Dismiss Vela's and Galindo's Motion to Enforce the Consent Decree

Britten argues that Vela's and Galindo's amended motion to enforce the consent decree must be dismissed "for failure to state a cause of action." (Def.'s Br. at 22, ECF No. 98.) He states that his motion to dismiss is made "pursuant to Neb. Ct. R. of Pldg. in Civ. Actions § 6-1112(b)(6)," (Def.'s Mots. at 1, ECF No. 97), which is a Nebraska Court Rule that appears to be analogous to Federal Rule of Civil Procedure 12(b)(6).[3] It seems to me that Rule 12(b)(6) is inapplicable here because Vela and Galindo have filed a motion to enforce the consent decree (as opposed to a complaint), and because Britten appears to seek the denial of Vela's and Galindo's motion (as opposed to the dismissal of claims set forth in the pleadings in this case). Nevertheless, Britten's arguments persuade me that Vela's and Galindo's motion to enforce the consent decree must be denied.

Vela and Galindo seek an order holding TSCI in contempt for violating the consent decree. (Br. at 2, 6, 8, ECF No. 96.) To obtain such an order, Vela and Galindo have "the burden of establishing by clear and convincing evidence that the decree is being violated." Wycoff v. Hedgepeth, 34 F.3d 614, 616 (8th Cir. 1994). See also Mahers v. Hedgepeth, 32 F.3d 1273, 1274 (8th Cir. 1994); Jones v. U.S. Dept. of Hous. & Urban Dev., 68 F. App'x 754, 756 (8th Cir. 2003). Even if I were to assume that all of Vela's and Galindo's allegations are true, it is clear that Vela and Galindo cannot satisfy this burden.

"When construing a consent decree, courts are guided by principles of contract interpretation and, where possible, will discern the parties' intent from the unambiguous terms of the written consent decree, read as a whole." Pure Country, Inc. v. Sigma Chi Fraternity, 312 F.3d 952, 958 (8th Cir. 2002). See also White v. National Football League, 585 F.3d 1129, 1141 (8th Cir. 2009). The consent decree requires the defendants to provide to "Death Row Inmates" certain minimum levels of law library access, telephone usage, access to photocopies, exercise, dayroom time, and legal research training. (See Def.'s Index, Ex. 2 at 2-6, ECF No. 99-2.) The consent decree also states,

---

[3] The Nebraska Court Rules of Pleading in Civil Cases do not apply in this court; the Federal Rules of Civil Procedure govern in this action. See Fed. R. Civ. P. 1.

5

however, that it "shall apply to Plaintiffs so long as they remain in special custody status solely by reason of the nature of their sentence." (Id. at 6.) Thus, under the plain and unambiguous terms of the consent decree, Vela and Galindo cannot claim a right to the levels of law library access, telephone usage, legal assistance and training, exercise time, and dayroom time specified in the consent decree during periods when they were not "in special custody status solely by reason of" their death sentences, but were instead in special custody status for some other reason.

Vela and Galindo were placed in disciplinary segregation after they were found guilty of violating prison rules in December 2008 and February 2009, respectively. (See Def.'s Index, Exs. 1-J & 1-M, ECF No. 99-1.) Before their terms in disciplinary segregation expired, both Vela and Galindo were placed on administrative confinement until February 2010, when they were transferred back to death row. (See Def.'s Index, Exs. 1-K, 1-L, 1-N, & 1-O, ECF No. 99-1.) During their time in disciplinary segregation and administrative confinement, Vela and Galindo were not in special custody status solely by reason of their death sentences. Rather, they were segregated because they were found to have violated prison rules and because they posed a threat to the safety and security of the prison. (See Def.'s Index, Ex. 1, Britten Aff. ¶¶ 15, 17, 19, ECF No. 99-1; Def.'s Index, Exs. 1-J through 1-O, ECF No. 99-1.) Furthermore, all of Vela's and Galindo's allegations that Britten imposed restrictions upon them that violate the terms of the consent decree relate to the time when the men were in administrative segregation. In the brief supporting their motion to enforce the consent decree, they state,

> As prisoners on administrative segregation status in the Security Management Unit ("SMU"), Vela and Galindo were entitled to only one hour of law library access per week. During this one hour per week, Vela and Galindo were not permitted the assistance of a trained Legal Aide and were in full restraints, making it very difficult to write, type or hold books. Vela and Galindo did not receive any legal research training by a trained lawyer; rather, they received "assistance" with Westlaw, the online legal research database, from prisoners who had been incarcerated for long periods of time and, by virtue of this additional time, had more experience with Westlaw.
>
> While confined in SMU, Vela and Galindo were permitted only one hour of exercise outside yard time six days per week. Vela and Galindo did not receive forty minutes of dayroom time per day.

6

(Br. at 4, ECF No. 96 (emphasis added; citations and footnote omitted).) Similarly, in their amended motion to enforce the consent decree, Vela and Galindo ask this court to extend the benefits of the consent decree to inmates "on administrative suspension." (Am. Mot. at 1-2, ECF No. 95.) Because such an extension would be contrary to the plain and unambiguous terms of the consent decree, I find that Vela and Galindo cannot establish that the restrictions they faced while in administrative segregation violated the decree.

In response to the defendant's motion, Vela and Galindo argue that "they are entitled to legal materials regardless of their administrative classification status, as well as the knowledge necessary to properly use those materials, like Westlaw." (Br. at 10, ECF No. 105.) They add that "they did not receive adequate yard time, dayroom time, and law library time, and they have not received any legal training or access to a trained lawyer to help them with legal research." (Id.) But Vela and Galindo did not file a complaint alleging that their access to legal materials, exercise, the dayroom, the law library, and legal training was inadequate (in a general or absolute sense) during their time of their administrative segregation. Instead, they filed a motion for an order holding the defendant in contempt for violating the terms of the 1986 consent decree. That decree does not speak to the sort of law library access, legal training, exercise privileges, etc. that must be afforded to inmates placed in disciplinary or administrative segregation, and the defendant cannot be held in contempt for taking actions that are plainly beyond the scope of the decree.

Vela's and Galindo's motion raises the relatively narrow question of whether the restrictions placed on them during their administrative segregation violate the terms of the 1986 consent decree. Because the consent decree applies only "so long as [death row inmates] remain in special custody status solely by reason of the nature of their sentence," (Def.'s Index, Ex. 2 at 6, ECF No. 99-2), Vela and Galindo cannot show that those restrictions violated the decree, and their motion to enforce the decree must be denied.

**B. Britten's Motion to Terminate the Consent Decree**

Britten argues that "the Consent Decree must be immediately terminated pursuant to 18 U.S.C. § 3626(b)(1)." (Def.'s Mots. at 1, ECF No. 97.) Vela and Galindo resist this argument and ask that an evidentiary hearing be scheduled to allow them to "demonstrate that prospective relief remains necessary to correct a current and ongoing violation of a federal right." (Br. at 9, ECF No.

105.) Although I am not persuaded that an evidentiary hearing is necessary at this time, I find that Vela and Galindo–and the other death row inmates–should be given an opportunity to supplement the record and attempt to prove a current and ongoing violation of a federal right.

"In 1996, Congress enacted the Prison Litigation Reform Act (PLRA), which outlines appropriate remedies in civil litigation regarding prison conditions." Hines v. Anderson, 547 F.3d 915, 917 (8th Cir. 2008) (citing 18 U.S.C. § 3626). "Section 3626(b) of the PLRA addresses the termination of relief and applies retroactively to prospective relief that was entered before the statute's enactment." Id. (citing 18 U.S.C. § 3626(b)(1)(A)(iii)). It states, "In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener . . . in the case of an order issued before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment." 18 U.S.C. § 3626(b)(1)(A)(iii). "It also allows for the immediate termination of prospective relief '[if the relief was approved or granted] in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation.'" Hines, 547 F.3d at 917 (quoting 18 U.S.C. § 3626(b)(2)). A limitation provides, however, that "[p]rospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3). The term "prospective relief," as it is used in § 3626, encompasses consent decrees. See 18 U.S.C. § 3626(g)(7), (9).

Citing § 3626(b)(2), Britten argues that the consent decree must be terminated immediately because it contains "no statement . . . that the relief [it affords] is narrowly drawn, extends no further than necessary to correct the violation of the Federal right or . . . is the least intrusive means necessary to correct the violation of a Federal right." (Def.'s Br. at 9, ECF No. 98.) He argues further that there is no evidence that the consent decree "remains necessary to correct a current and ongoing violation of the Federal right," 18 U.S.C. § 3626(b)(3), stating that "[t]he conditions on the Death Row Unit as set out in the Death Row Unit Handbook clearly demonstrate that there is substantial compliance with the Consent Decree," and that the Westlaw access and training provided

8

to death row inmates is consistent with the relevant Supreme Court cases concerning prisoners' right of access to the courts. (Def.'s Br. at 11, 12-14, ECF No. 98.)

There appears to be no dispute that the consent decree was entered "in the absence of a finding by the court that the relief [it affords] is narrowly drawn, extends no further than necessary to correct the violation of the federal right, and is the least intrusive means necessary to correct the violation of the federal right." 18 U.S.C. § 3626(b)(2). Thus, the consent decree must terminate immediately unless I make the written findings described in § 3626(b)(3).

Before I make (or decline to make) the findings described in § 3626(b)(3), Vela, Galindo, and their fellow death row prisoners should be allowed an opportunity "to supplement the record with evidence of current practices to prove a current and ongoing violation." Hines v. Anderson, 547 F.3d 915, 920 (8th Cir. 2008) (quoting Harvey v. Schoen, 245 F.3d 718, 721 (8th Cir. 2001)). See also id. at 917, 920 (noting that the district court allowed the parties to take five depositions each and serve 25 interrogatories, allowed the inmates to hire an expert witness (with some expenses paid by the defendant), and allowed the inmates to submit an unlimited number of prisoner declarations). Although Britten submits that "[t]he conditions on the Death Row Unit . . . [are in] substantial compliance with the Consent Decree," (Br. at 11, ECF No. 98 (emphasis added)), the question at hand–i.e., whether death row inmates are experiencing current and ongoing violations of their Federal rights–is a distinct one. Furthermore, the death row inmates must have an opportunity to respond to Britten's evidence concerning "the conditions on the Death Row Unit"–which consists solely of rules, regulations, and other like documents (see generally Index, ECF No. 99; see also Br. at 10-11, ECF No. 98)–and indicate whether their actual treatment on death row conforms to the practices described in those documents. Similarly, the death row inmates must have an opportunity to describe the Westlaw access and training they have received and argue whether the limits placed on this access and training amount to a current and ongoing violation of their Federal rights.

In the reply brief he submitted in support of his motion to terminate the consent decree, Britten emphasizes that Vela and Galindo have not alleged that the conditions they faced during their segregation were unconstitutional. (See generally ECF No. 106.) Vela's and Galindo's filings do indeed focus on the applicability of the consent decree to them during their administrative segregation, and, as I explained above, I have concluded that their motion to enforce the decree must

9

be denied. Britten's motion to terminate the decree raises issues that are distinct from those raised in Vela and Galindo's motion, however. More importantly–and as John Lotter's letter demonstrates–inmates other than Vela and Galindo have an interest in the preservation of the consent decree, and those inmates have not yet had an opportunity to argue against its termination. To that end, the class of inmates covered by the consent decree should be given an opportunity to supplement the record.

Vela and Galindo argue that they must be granted "the opportunity to present evidence at a hearing concerning current and ongoing violations of their rights under the Consent Decree." (Br. at 10, ECF No. 105.) Although the due process clause does not afford the inmates a right to such a hearing, see Hines v. Anderson, 547 F.3d 915, 919 (8th Cir. 2008), a hearing may be necessary if specific facts uncovered during the discovery process would, if proven true, "amount to a current and ongoing constitutional violation," Cagle v. Hutto, 177 F.3d 253, 258 (4th Cir. 1999). See also Harvey v. Schoen, 245 F.3d 718, 721 (8th Cir. 2001) (citing Cagle for the proposition that a "pre-termination evidentiary hearing is discretionary unless party opposing termination alleges specific facts amounting to current and ongoing constitutional violation"). Vela's and Galindo's request for an evidentiary hearing is denied without prejudice.

### C. Lotter's Motion to Appoint Counsel

Lotter asks that an attorney be appointed to represent his interests, together with the interests of "the rest of the Death Row Population," in this case. (Mot. at 2, ECF No. 103.) His request will be granted.

Before this case may proceed, a number of preliminary issues must be addressed. For example, I must determine whether the attorney who assisted Vela and Galindo with their motion to enforce the consent decree is willing and able to represent the entire class of death row inmates in their opposition to Britten's motion to terminate the consent decree; if he is not, new counsel must be appointed. After the matter of the inmates' representation is settled, an order outlining the progression of this case, including a discovery plan, must be prepared. In order to begin to resolve these issues, counsel are directed to contact my chambers within seven days of the date of this order to schedule a joint meeting or teleconference.

**IT IS ORDERED** that:

1. Vela's and Galindo's "Amended Motion to Enforce Consent Decree," (ECF No. 95), is denied;

2. Britten's "Motions to Terminate Consent Decree and Dismiss Case," (ECF No. 97), are granted insofar as they seek the denial of Vela's and Galindo's motion to enforce the consent decree, but in all other respects, I reserve ruling on the motion until the death row inmates have been given an opportunity to supplement the record;

3. Lotter's motion to appoint counsel, filing 103, is granted; and

4. counsel shall contact my chambers within seven days of the date of this order to schedule a meeting or teleconference concerning the progression of this case.

Dated December 6, 2010.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge